**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

IXONIA BANK d/b/a NOVUS HOME MORTGAGE,

        Plaintiff,

v.

TEXANA BANK NA; SCOTT SAX; and
MICHAEL COLLINS,

        Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Ixonia Bank and its Novus Home Mortgage division ("Novus"), for its Complaint against Defendants Texana Bank NA, Scott Sax, and Michael Collins, states and allege as follows:

1.      How can a business protect itself from the bad actions of unscrupulous employees and competitors? What should a business do when a senior executive develops a scheme with a competitor to steal its employees, data, and customers? Why is it so hard for some business owners to adhere to standards of ethics and good faith practices?

2.      Plaintiff Novus Home Mortgage hoped to never have to answer these questions. Yet two of its former senior executives, Defendants Scott Sax and Michael Collins, working in close collaboration with Defendant Texana Bank NA, designed and executed a plan to "lift out" Novus's Denver-based retail mortgage lending operation for

their benefit. Defendants stole Novus's employees, customers, data, and goodwill,
resulting in unfair competition and unjust enrichment.

3.      Defendants' actions were intentional and unlawful. By no later than
December 2024, Sax and Collins had decided to leave Novus for Texana. Instead of
notifying Novus, they actively solicited approximately two dozen other employees to join
them while simultaneously breaching their agreements with Novus. For example, for at
least one month but perhaps longer, they and their team remained employed by Novus
while working on Texana's behalf and against Novus's interests. As discussed below,
they took incoming customers and business opportunities and immediately passed them
along to Texana. Further, they removed confidential business information from Novus
for their use at Texana, with Texana's knowledge and active participation.

4.      After Novus started asking questions, Sax and Collins finally admitted to
Novus on January 3, 2025 that they planned to leave Novus for Texana and take 23
employees with them. In that conversation, they lied to Novus and claimed they had not
transferred any loan files from Novus to Texana and that they had not transferred any
information to themselves.

5.      After their termination, Sax and Collins attempted to trespass upon their
former office space, aggressively demanding that the building's management and
cleaning staff allow them in Novus's office despite no longer working for Novus and
despite having engaged in numerous unlawful and damaging actions against Novus.
Sax and Collins also claimed that Texana would assume Novus's sublease so long as
they could "inspect" the office first. But, on information and belief, this too was just a

ruse to access the office and take more information and assets belonging to Novus for
use at Texana.

6.      Their motivations became clear once Novus began clearing out the office.
That space—paid for by Novus—had long since ceased to be an office where work was
done for Novus's benefit. It was instead strewn with Texana documents and printouts of
emails from Texana's loan processors showing that, contrary to Sax and Collins's
representations to Novus, they and their team had been working diligently to shuttle
every business opportunity away from Novus and to Texana with Texana's active
participation in the unlawful scheme. And Sax, Collins, and the staff they supervised
and solicited to leave Novus had removed equipment and begun boxing up items,
clearly anticipating a move well before they notified Novus.

7.      Defendants' conduct was not only unethical, it was also illegal and has
caused Novus millions of dollars in losses. Through this action, Novus seeks relief from
Texana, Sax, and Collins for the damage they inflicted on Novus and the value they
wrongly stole for themselves.

**PARTIES**

8.      Plaintiff Ixonia Bank is a Wisconsin state-chartered bank with its principal
place of business in Wisconsin. Novus Home Mortgage is a division of Ixonia Bank and
is a nationwide mortgage lender.

9.      Defendant Texana Bank NA is a nationally chartered bank with its
principal place of business in Texas. Texana Bank offers mortgage lending services,
now including in Denver, Colorado.

10.     From approximately May 2024 to January 2025, Defendant Scott Sax was employed by Novus in its Denver office as an Executive Western Regional Manager. Sax was a "highly compensated" employee under the standards set by the Colorado Department of Labor and Employment for the entirety of his employment at Novus. Since at least January 2025, Sax has been employed by Texana. On information and belief, Sax resides in Greenwood Village, Colorado.

11.     From approximately May 2024 to January 2025, Defendant Michael Collins was employed by Novus in its Denver office as an Executive Western Regional Manager.

Collins was a "highly compensated" employee under the standards set by the Colorado Department of Labor and Employment for the entirety of his employment at Novus.

Since at least January 2025, Collins has been employed by Texana. On information and belief, Collins resides in Lone Tree, Colorado.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367 because this action arises in part under the laws of the United States and because the remaining claims are so related to the federal claims that they form part of the same case or controversy.

14.     Each Defendant is subject to personal jurisdiction in this Court because this action arises out of actions the Defendants took in Colorado to harm Novus.

15.     Sax and Collins are additionally subject to personal jurisdiction in this Court because they executed Protective Agreements with Novus in which they agreed "venue shall be the State or Federal courts sitting in Colorado and the parties waive any defense, whether asserted by motion or pleading, that the venue specified by this [agreement] is an improper or inconvenient venue."

## BACKGROUND

### I.     Novus Home Mortgage invests significant resources in its employees and in building customer and referral relationships.

16.     Novus provides mortgage services to individuals and businesses across the United States.

17.     The banking business relies on relationships, and it takes years to develop the types of relationships with customers and referral sources that keep them returning to Novus for their banking and lending needs.

18.     Because of how difficult it is to earn and keep a customer's business, Novus invests significant resources to train and assist its employees in strengthening their skills and relationships with Novus's customers. The loss of an employee means the loss not only of revenue but also customer trust and goodwill.

19.     In particular, Novus hires and trains management staff to oversee and support its operations. Those managers and executives, which until recently included Sax and Collins, are responsible for training and overseeing their staffs and developing business.

20.     By investing in its employees and customer relationships, Novus has

generated significant revenues and profits. Novus anticipated this would have continued

if Defendants had not schemed to destroy the business it took Novus years to build.

**II.    Novus hires Sax and Collins to build its Colorado presence and enters into agreements with them to protect Novus's customer and employee relationships.**

21.     In May 2024, Novus hired Sax and Collins to strengthen Novus's presence

in Colorado and build long-term relationships with customers and referral sources.

22.     Novus made significant investments to give Sax and Collins the team and

resources they needed to succeed in Denver in a new office space.

23.     In August 2024, Novus subleased office space in Denver for Sax and

Collins and their team (the "Denver Novus Office"). Novus must pay nearly $300,000 in

rent over the life of the sublease that has now been cleared out and is sitting empty.

24.     Novus invested in recruiting a team to support Sax and Collins. In

particular, Novus paid fees to a recruiter to locate and hire talented employees for Sax

and Collins.

25.     Sax and Collins's team included the following (with Sax and Collins, the

"Former Employees"):

| Employee | Position |
|----------|----------|
| John Adam | Loan Officer |
| Tyler Andersen | Loan Officer Assistant |
| Keith Balesk | Loan Officer |
| Joseph Ball | Part-time Loan Officer |

| | |
|---|---|
| Kevin Barrett | Part-time Loan Officer |
| Tammy Benoit | Loan Processor 3 |
| Susan Callaghan | Loan Officer |
| Adam Cocozza | Part-time Loan Officer |
| Thomas Daymil | Loan Officer |
| Tommy Frangella | Loan Officer |
| Ryan Graham | Loan Officer |
| Dana Holland | Loan Officer |
| Dallin Johnson | Loan Officer |
| David Kravets | Loan Officer |
| Christine Lombard | Loan Officer |
| James McClure | Loan Officer |
| Clayton Olson | Loan Officer Assistant |
| Herbert Pounders | Loan Officer |
| Sara Riney | Loan Processor 1 |
| Neve Seibert | Loan Officer |
| Robert Smith | Part-time Loan Officer |
| Kevin Tuccitto | Loan Officer |
| Albin Ulle | Part-time Loan Officer |
| Iris Vargas Castillo | Loan Officer |

26.    Novus entered into multiple agreements with Sax, Collins, and the other
Former Employees (with the exception of Benoit and Riney, who performed
administrative roles).

27.    For example, Sax and Collins each executed a "Non-Producing Branch
Manager Employment Agreement" with Novus.

28.    Former Employees Adam, Ball, Callaghan, Daymil, Frangella, Graham,
Holland, Johnson, Kravets, Lombard, McClure, Pounders, Siebert, Tuccito, and Vargas
Castillo each executed a "Loan Officer Employment Agreement" with Novus.

29.    Former Employees Balesk, Barrett, Cocozza, Smith, and Ulle each
executed a "Part-Time Loan Officer Employment Agreement" with Novus.

30.    Former Employees Andersen and Olson each executed a "Loan Officer
Assistant Employment Agreement" with Novus.

31.    The agreements described above executed by the Former Employees are,
together, the "Employment Agreements."

32.    Each of the Former Employees (with the exception of Benoit and Riney)
also executed a "Protective Agreement" with Novus. Before signing, the Protective
Orders (and before accepting employment offers with Novus), the employees who were
based in Colorado (all except Balesk, Frangella, and Kravets) received and signed
notices stating:

> This notice is to advise you that [Novus] is, contemporaneously with this
> notice, providing you with a Protective Agreement (the "Agreement")
> containing covenants that could restrict your options for subsequent
> employment following separation from the Company, in that you will be
> prohibited from certain solicitation of Restricted Customers, Referral
> Sources, employees, etc. as developed in Section 3.1 through Section 3.4

of the Agreement (as modified by the Colorado Addendum) and from disclosing or using Confidential Information.

33.    The Employment Agreements and Protective Agreements contain several provisions to protect Novus's investments in the employees, to protect Novus from unfair competition, and to protect Novus's customers from unauthorized disclosures of their confidential information.

34.    For instance, each of the Employment Agreements provides the following:

a.    Novus's "Confidential Material" "shall not be used by Employee, including after termination, for any purpose unrelated to Employee's work for [Novus]." (Non-Producing Branch Manager Employment Agreement § 4.a; Part-Time Loan Officer Employment Agreement § 7.a; Loan Officer Assistant Employment Agreement § 7.a.)

b.    The Former Employees may not "use Confidential Material or Trade Secrets for the benefit of any person or entity other than [Novus]" and may not "remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Material or Trade Secrets, except as required to perform responsibilities for [Novus.]" (Non-Producing Branch Manager Employment Agreement § 4.b; Part-Time Loan Officer Employment Agreement § 7.b; Loan Officer Assistant Employment Agreement § 7.b.)

c.    Upon termination of employment with Novus, the Former Employees must "promptly deliver to [Novus] the originals and copies of all documents, records and property of any nature whatsoever in the Employee's possession or control which contain or consist of the Confidential Information." (Non-Producing Branch Manager Employment Agreement § 4.d; Part-Time Loan Officer Employment Agreement § 7.d; Loan Officer Assistant Employment Agreement § 7.d.)

d.    "Any computer, furniture, equipment, software, or log-in credentials provided" by Novus to the Former Employees "shall be used solely for the purpose of generating Business for Company." (Non-Producing Branch Manager Employment Agreement § 7; Part-Time Loan Officer Employment Agreement § 10; Loan Officer Assistant Employment Agreement § 10.) Upon termination of employment, the Former

Employees must "immediately deliver to Company any or all of Company's property in Employee's possession or under Employee's control, including, but not limited to computers, company phones, furniture, equipment, software (including all copies of computer software and all data), log-in credentials, and any Confidential Material." (*Id.*)

e.  While employed by Novus, the Former Employees "shall not be employed by or represent any other mortgage banker, mortgage broker or other financial services provider to consumers[.]" (Non-Producing Branch Manager Employment Agreement § 12; Part-Time Loan Officer Employment Agreement § 5; Loan Officer Assistant Employment Agreement § 5.)

35.    The Protective Agreements contain the following provisions:

a.  During their employment with Novus, the Former Employees may not "directly or Indirectly engage in any employment or business activity which is competitive with, or would otherwise conflict with, Employee's employment by the Company." (Protective Agreements § 1.1.)

b.  The Former Employees must "disclose…to any future prospective employers the existence of this Agreement and the nature of Employee's confidentiality and restrictive covenant obligations arising from it before Employee accepts any new position of employment." (Protective Agreements § 1.2.)

c.  The Former Employees may not solicit Novus customers, referral sources, and employees during employment and for one year following termination. (Protective Agreements §§ 3.1–3.3.)[1]

d.  The Former Employees may not use "Confidential Information or Trade Secrets" for the benefit of anyone but Novus and may not remove or copy "Confidential Information or Trade Secrets" except as needed to perform responsibilities for Novus. (Protective Agreements § 4.1.);

---

[1] Defendants Sax and Collins executed "Regional Manager Addendums" with Novus that would have relaxed some of Sax and Collins's non-solicitation obligations and data retention restrictions if Sax or Collins were terminated "for any reason other than Employee's breach of the Employment Agreement." Sax and Collins were both terminated for breaches of their Employment Agreements, so these relaxations of their obligations and restrictions do not apply.

    e.   Sax and Collins must immediately return all of Novus's property on the Employee's last day of work and to delete any Novus information from the Employee's personal devices. (Protective Agreements § 5.)

**III.**    **Defendants secretly plot for Sax, Collins, and the Former Employees to begin working for Texana's benefit while still employed by Novus in breach of their agreements and violation of their duty of loyalty.**

36.    By early December 2024, Sax and Collins had decided to disregard their obligations to Novus and had solicited some or all of the Former Employees to leave Novus and join Texana. By December 11, 2024, Texana had begun completing paperwork needed for Former Employees to transfer their Nationwide Multistate Licensing System (NMLS) registration from Novus to Texana. But no one informed Novus of these plans until January 2025.

37.    Worse, by December 2024, Sax and Collins and the other Former Employees, despite still being employed by Novus, had ceased working for Novus's benefit and were secretly working on behalf of Texana. Instead of processing incoming loan applications with Novus, they sent those opportunities to Texana. They did this with Defendants' knowledge and encouragement, often using personal email accounts to hide their unethical and wrongful conduct from Novus.

38.    For example, on December 4, 2024, Former Employee Dana Holland, while still employed by Novus, emailed Manny Uceda, Texana's Vice President of Mortgage Lending, from her personal email account. Holland wanted Uceda's help figuring out if she could process a particular type of loan with Texana. Uceda forwarded that email to a representative at PennyMac Financial Services and stated that Sax and Collins' team at Novus was a "group closing 30–40 monthly units looking to join Texana

Bank." Uceda then added Sax to the chain, who responded enthusiastically, stating "Perfect!" and "Great news! Thank you!"

39.     On December 16, 2024, Former Employee Neve Seibert, while still employed by Novus, sent information regarding a pending loan from her Novus account to his personal email account. Texana, not Novus, processed that loan.

40.     On December 18, 2024, Seibert received an email in his Novus email account about a pending loan. Again, despite being employed by Novus, Seibert worked with Nella Longobardo, a Texana loan processing manager, to ensure Texana and not Novus would receive this loan.

41.     On December 19, 2024, Former Employee Kevin Tuccitto, still employed by Novus, emailed loan information from his Novus account to his personal account and then forwarded it to Sax and Manny Uceda at Texana, stating "I have a new loan I'm bringing to Texana[.]"

42.     On December 30 and 31, 2024, Former Employee Joseph Ball, while still employed by Novus, sent himself four emails from his Novus account to his personal account attaching several confidential documents concerning a pending loan, including private and confidential information such as W-2 forms. That loan opportunity was provided to Texana, not Novus.

43.     On December 31, 2024, Former Employee Clayton Olson emailed himself from his Novus account to a Texana account in his name (cj.olson@texanabank.com). Novus had still not been informed that Sax, Collins, or any of the Former Employees planned to leave, but Texana had already created an email account for Olson,

demonstrating Texana's ongoing and active involvement in their deceit. Texana was working jointly with the Former Employees, including the individual Defendants, in breaching their duties to Novus and violating the law.

44.    Ball attached to his email several documents for a pending loan application, including contract documents and a tax bill. That loan opportunity was provided to Texana, not Novus.

45.    The Former Employees also surreptitiously removed highly sensitive, confidential, proprietary, trade secret information from Novus for use at Texana in express violation of their obligations to Novus.

46.    The Denver Novus office maintained a spreadsheet of pending loans that it called the "pipeline." The "pipeline" spreadsheet was regularly updated and circulated by email, and it contained information including loan numbers, borrower names, loan amounts, estimated closing dates, and information concerning the progress of the loan application.

47.    On December 5, 2024, Former Employee Parker McClure forwarded the pipeline spreadsheet to Defendant Scott Sax and stated "I uploaded it to teams so you should be all set[.]" On December 10, 12, and 19, 2024, McClure notified Sax that he had uploaded the most current pipeline spreadsheets to "box" or "the box." Sax thanked McClure each time.

48.    On information and belief, McClure was referring to Microsoft Teams and Box, popular filesharing services where users can upload files and share them with others. McClure and Sax had no legitimate business reason to upload this information

to a non-Novus server, and doing so breached their contractual obligations to Novus. On information and belief, they uploaded these spreadsheets so they could use the confidential information they contained for Texana's benefit and access the information after their employment with Novus terminated.

49. On December 11, 2024, Former Employee Adam Cocozza, while still employed by Novus, sent an email from his Novus account to his personal account with the subject line "Clients for Boomerang Mailing List" and attached a spreadsheet with the filename "WHOLE OFFICE LOAN LIST.xlsx." The spreadsheet contained over 6500 entries regarding completed or pending loans, including names and contact information for borrowers, buyers' agents, and sellers' agents and detailed information regarding loan amounts and interest rates. Boomerang is a direct marketing firm. On information and belief, Sax, Collins, and the Former Employees intended to use this list to notify customer and prospective customer of their move from Novus to Texana.

50. On December 30, 2024, Former Employee Joseph Ball, in addition to emailing himself confidential loan information, also sent himself at least three emails from his Novus account to his personal account attaching several Novus documents to each email, including forms, checklists, and templates. On information and belief, he sent himself these documents for use at his anticipated new position at Texana. These documents were the property of Novus.

51. And from December 3, 2024 to January 3, 2025, Former Employee David Kravets forwarded himself approximately *468* emails from his Novus account to his personal account. On information and belief, he emailed himself this information for use

at Texana.

### IV.    Sax and Collins lie to Novus, claiming they had not moved any loan applications to Texana.

52.    On the evening of Friday, January 3, 2025, after working in secret for at least a month to shuttle loan applications to Texana and remove confidential information from Novus, Sax and Collins spoke with Novus's National Sales Director, Brian Jensen, and finally admitted that they were leaving Novus for Texana and had solicited the Former Employees to join them.

53.    Jensen asked Sax and Collins if they had transferred any loan files or applicants from Novus to Texana. Sax and Collins assured him they had not. Trusting that representation, Jensen followed up with an email that, among other things, stated "[w]e expect the active pipeline to close with Novus…We will work with your processors on Monday to get a full knowledge transfers of the loans in the pipeline that will be closing."

54.    Sax and Collins lied to Jensen. As discussed above, for at least a month the Former Employees, with Sax, Collins' and Texana's knowledge and approval, had been transferring loans to Texana. In fact, when Novus recently cleared out the Denver Novus Office, it found a printed copy of a January 2, 2025 email from Nella Longobardo at Texana to Sax and Collins, several other Former Employees, and Texana VP Manny Uceda with the subject line "Denver loans." The email provided a status update on 14 loans Texana was processing that had been submitted by the Former Employees while still employed by Novus. Longobardo sent that email just a day before Sax and Collins falsely represented to Novus that no loan applications had been transferred to Texana.

15

55.     Novus also found several "Underwriting Approval Summaries" on Texana letterhead in the Denver Novus Office regarding loans Texana was processing that had been referred by Former Employees in December 2024, while they were still employed by Novus.

56.     Upon learning that Sax, Collins and the Former Employees planned to join a competitor, Texana, Novus terminated them and changed the locks on the Denver Novus Office so they could no longer use the office to advance Texana's interests to Novus's benefit.

57.     The Former Employees failed to return equipment Novus issued to them, including 28 laptop computers containing confidential Novus information.

58.     The web domain used by the Denver Novus Office, although owned by Novus, is registered in the names of two Former Employees. They have failed to transfer control of the web domain to Novus.

59.     Initially, Sax, Collins, and Texana agreed to assume the sublease for the Denver Novus Office and to continue using it for Texana. However, they insisted they be given access to the office to "inspect" it before assuming the sublease. This made no sense: Sax and Collins worked out of the office from the beginning of the sublease through January 6, 2025 and were more familiar with it and its condition than anyone else. They had no need to "inspect" it unless they planned to steal more Novus data, information, or assets.

60.     Sax and Collins thereafter tried several times to gain unauthorized entry to the Denver Novus Office, including by contacting and harassing the building's

management and cleaning staff to let them in. The building's management informed Novus that Sax had been aggressive and threatening in demanding access. Sax and Collins of course have no right to access the Denver Novus Office after their termination; in fact, it would be a criminal trespass.

61.    On information and belief, Sax and Collins wanted to access the Denver Novus Office after their termination to continue removing confidential information for Texana's benefit and to destroy evidence indicating the extent to which they had been working on Texana's behalf while employed by Novus, such as the printed emails and documents from Texana that Novus has already discovered.

## V.    Defendants have damaged Novus and unjustly enriched Texana.

62.    Defendants' actions have damaged and will continue to damage Novus.

63.    Some of Novus's losses are immediate and easily measurable. For example, Novus is now party to a sublease for the Denver Novus Office that it no longer needs and which was provided to the individual Defendants at great expense so they could build out the Denver office and support the growth of Novus.

64.    Further, since at least December 2024, Sax, Collins, and the other Former Employees were using the Denver Novus Office, their company-issued laptops, their Novus email accounts, and every other resource Novus provided them to work against Novus's interests and on behalf of one of its competitors, Texana. Novus has been significantly damaged by these actions, and Texana unjustly enriched by them.

65.    Because of Defendants' actions, Novus's investments in recruiting and training the Former Employees now inure to Texana's benefit and not Novus's. In

particular, Novus paid a recruiter for at least one employee who never performed any work for Novus and instead immediately began working for Texana, yet Texana has refused to reimburse Novus for that expense and has improperly retained the benefit.

66.    And despite Sax and Collins's lies, they and the Former Employees shuttled as many opportunities as possible to Texana while still employed by Novus and while obligated to work for Novus's benefit and not its competitor's. Defendants' actions have resulted in Texana and not Novus profiting from those opportunities.

67.    But Novus's most profound losses are as of yet fully unknown and will continue well into the future.

68.    Novus has lost the goodwill it entrusted Sax and Collins to build in Denver and the surrounding area. It has lost the Former Employees to Texana despite Sax and Collins' explicit contractual obligations not to solicit them to leave. Novus is now subject to competition from its own workers who left because of Defendants' breach of their obligations. Novus not only lost the loans that the Former Employees funneled to Texana while they were supposed to be working for Novus, it will continue losing business opportunities for years to come that it would have had but for Defendants' wrongful actions.

69.    And Texana has obtained unknown amounts of Novus's confidential and trade secret information because of Sax, Collins, and the Former Employees. It is impossible for Novus to know at this early stage, without the benefit of discovery, the extent to which the Former Employees raided Novus's files and took them for Texana's benefit. Based on the information available to Novus, it appears the Former Employees

attempted to use their personal email addresses as much as possible to escape Novus's detection while they actively plotted against it. It also appears they may have used filesharing services including Box, Microsoft Teams, and a Microsoft 365 Family subscription to remove and store information in the cloud without detection by Novus. The ultimate extent of Defendants' actions to strip Novus of its employees, customers, potential customers and confidential information to benefit Texana remains to be seen.

70.    Through this action, Novus seeks relief for Defendants' unfair, unethical, and illegal conduct which has and will cost Novus millions of dollars.

## COUNT ONE
### Breach of Contract
### (Against Sax & Collins)

71.    Novus realleges and incorporates by reference each of the allegations above as if fully set forth herein.

72.    The Protective Agreements are valid and enforceable contracts.

73.    Sax and Collins were both "highly compensated" employees under the standards set by the Colorado Department of Labor and Employment during the entirety of their employment at Novus. As alleged above, before accepting employment offers with Novus, Sax and Collins received and signed notices regarding the nonsolicitation and confidentiality restrictions in the Protective Agreements.

74.    Sax and Collins breached the Protective Agreements in myriad ways:

    a.    They worked on behalf of Texana, in breach of their obligation to not "directly or Indirectly engage in any employment or business activity which is competitive with, or would otherwise conflict with, Employee's employment by [Novus]." (Protective Agreements § 1.1.)

b.  The Protective Agreements provide that "Employee specifically understands and agrees that information pertaining to borrowers or potential borrowers of [Novus] that Employee obtains as an employee of [Novus] is and shall remain the Confidential Information of [Novus] and shall not be used by Employee at any time, including after the Last Day (defined below), for any purpose unrelated to Employee's work for [Novus]." (Protective Agreements § 2.1.) But Sax and Collins oversaw the Former Employees while they removed borrower information to personal email accounts and then provided it to Texana for Texana's use, often being themselves copied on these communications.

c.  On information and belief, Sax and Collins removed other "Confidential Information" from Novus, either directly or via their oversight and direction of the Former Employees, in further breach of their confidentiality obligations to Novus. (Protective Agreements §§ 2.1, 4.1.)

d.  Sax and Collins solicited and encouraged the Former Employees to leave Novus and join Texana, in breach of their employee nonsolicitation obligations. (Protective Agreements § 3.3.)

e.  Sax and Collins solicited and encouraged Novus customers, either directly or via their oversight and direction of the Former Employees, to terminate their relationships with Novus and enter relationships with Texana, in breach of their customer nonsolicitation obligations. (Protective Agreements § 3.1.)

f.  Sax and Collins breached their obligation to, upon termination, "immediately return to [Novus] all property belonging to [Novus] (in electronic or hard-copy form)" and to "cooperate with [Novus] to remove or delete" Novus information from their personal devices. (Protective Agreements § 5.) Sax and Collins have not returned to Novus the laptops and other devices Novus issued them.

75.     On information and belief, discovery will uncover further breaches of the

Protective Agreements.

76.     Sax and Collins's breaches have damaged Novus in an amount to be

determined at trial.

77.     Further, the Protective Agreements entitle Novus to "the recovery and return of any amount paid to [Sax and Collins] to enter into this Agreement, the disgorgement of any profits, commissions, or fees realized by Employee, [and] any subsequent employers[.]" (Protective Agreements § 8.)

78.     The Protective Agreements also provide that Sax and Collins "shall pay [Novus] all reasonable costs and attorneys' fees [Novus] incurred because of [Sax and Collins's] breach of this Agreement." (Protective Agreements § 8.)

**COUNT TWO**
**Tortious Interference With Contract**
**(Against all Defendants)**

79.     Novus realleges and incorporates by reference each of the allegations above as if fully set forth herein.

80.     The Employment Agreements and Protective Agreements executed by the Former Employees are valid and enforceable agreements.

81.     Sax and Collins were aware of each other's Employment Agreements and Protective Agreements. They held the same position in the same office and executed these agreements on the same day as one another. They understood these agreements were conditions of employment with Novus.

82.     Sax and Collins were further aware of the other Former Employees' Employment Agreements and Protective Agreements. Again, as managerial employees who oversaw the Former Employees, they understood these were standard agreements that Novus required of all employees that held the positions held by the Former

Employees. In fact, Collins signed the cover sheet to at least some of the Employment

Agreements.

83.     On information and belief, Texana was aware of the existence of the

Former Employees' Employment Agreements and Protective Agreements. The

Protective Agreements required the Former Employees to disclose "to any future

prospective employers the existence of this [Protective] Agreement and the nature of

Employee's confidentiality and restrictive covenant obligations arising from it before

Employee accepts any new position of employment." (Protective Agreements § 1.2.)

And Texana is a sophisticated and experienced bank and mortgage lender. It knows

that federal regulation including the Gramm-Leach-Bliley Act requires financial

institutions to take measures to prevent disclosure of nonpublic personal information. If

further knows that due to the competitive nature of the business, disclosure of

confidential information or solicitation of employees and customers can cause

significant damage. Given this, it is aware that banks and mortgage lenders nearly

always require employees who hold the positions held by the Former Employees to sign

confidentiality and nonsolicitation agreements.

84.     All Former Employees breached their Protective Agreements in the same

manner as Sax and Collins as alleged above. They also all breached various provisions

of their Employment Agreements:

> a.  They breached their obligations to, while employed by Novus, "not be
>     employed by or represent any other mortgage banker, mortgage
>     broker or other financial services provider to consumers[.]" (Non-
>     Producing Branch Manager Employment Agreement § 12; Part-Time
>     Loan Officer Employment Agreement § 5; Loan Officer Assistant
>     Employment Agreement § 5.)

    b.   They breached their confidentiality obligations by removing confidential and trade secret information (including customer information) and using it for their own benefit or that of Texana. (Non-Producing Branch Manager Employment Agreement §§ 4.a–b; Part-Time Loan Officer Employment Agreement § 7.a–b; Loan Officer Assistant Employment Agreement § 7.a–b.)

    c.   They breached their obligations, upon termination of employment with Novus, to "promptly deliver to [Novus] the originals and copies of all documents, records and property of any nature whatsoever in the Employee's possession or control which contain or consist of the Confidential Information." (Non-Producing Branch Manager Employment Agreement § 4.d; Part-Time Loan Officer Employment Agreement § 7.d; Loan Officer Assistant Employment Agreement § 7.d.)

    d.   They breached their obligations that "[a]ny computer, furniture, equipment, software, or log-in credentials provided" by Novus to the Former Employees "shall be used solely for the purpose of generating Business for [Novus]." (Non-Producing Branch Manager Employment Agreement § 7; Part-Time Loan Officer Employment Agreement § 10; Loan Officer Assistant Employment Agreement § 10.)

    e.   They breached their obligations, upon termination of employment, to "immediately deliver to Company any or all of Company's property in Employee's possession or under Employee's control, including, but not limited to computers, company phones, furniture, equipment, software (including all copies of computer software and all data), log-in credentials, and any Confidential Material." (Non-Producing Branch Manager Employment Agreement § 7; Part-Time Loan Officer Employment Agreement § 10; Loan Officer Assistant Employment Agreement § 10.)

85.    Each of the Defendants intended that the Former Employees breach their Employment Agreements and Protective Agreements.

86.    Sax and Collins solicited the Former Employees to work for Texana's benefit and were included on communications where Former Employees transferred confidential borrower information and business opportunities to Texana. On information

and belief, Sax and Collins did so believing they would be compensated by Texana for their breaches and disloyalty.

87.     Texana encouraged the illegal solicitation of the Former Employees by helping them transfer their NMLS registrations and providing Texana email accounts to Former Employees while they were still employed by Novus. It encouraged breaches of confidentiality obligations and customer nonsolicitation obligations by accepting that information and then processing loans for would-be Novus customers and reaping the financial benefit. These breaches further benefitted Texana by giving it a readymade foothold in Denver by bringing over Sax and Collins' team en masse. This would not have been possible but for breaches of the Employment Agreements and Protective Agreements.

88.     Defendants acted improperly in causing these breaches.

89.     Defendants' tortious actions damaged Novus in an amount to be determined at trial.

## COUNT THREE
### Tortious Interference With Prospective Business Relation
### (Against all Defendants)

90.     Novus realleges and incorporates by reference each of the allegations above as if fully set forth herein.

91.     Novus had an expectation of entering into mortgage contracts with existing and prospective customers, including those would-be customers that the Former Employees referred to Texana in December 2024 and January 2025.

92.    Defendants intentionally and improperly interfered with these prospective contractual relations and caused existing and prospective customers not to sign mortgage contracts with Novus and in many instances to sign them with Texana.

93.    This conduct was improper. As alleged in this complaint, Defendants accomplished their interference through violation of federal and state trade secrets laws, breaches of contracts, and torts.

94.    Defendants' tortious actions damaged Novus in an amount to be determined at trial.

**COUNT FOUR**
**Defend Trade Secrets Act (18 U.S.C. § 1836)**
**(Against all Defendants)**

95.    Novus realleges and incorporates by reference each of the allegations above as if fully set forth herein.

96.    Novus owns and maintains trade secret information including but not limited to databases of customers and potential customers and highly sensitive information concerning them, including tax returns, Social Security numbers, paystubs, W-2 forms, property valuations, purchase offers, purchase contracts, and loan applications.

97.    The trade secrets described above derive actual or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. For example, this information would permit a

competitor to emulate or counter Novus's marketing plans or market loans to Novus's customers and potential customers, thereby taking valuable business from Novus.

98.    The trade secrets described above are related to a product or service used in, or intended for use in, interstate or foreign commerce." For example, Novus and Ixonia Bank are based in Wisconsin. The trade secrets included information concerning Novus's nationwide business plans and customers and potential customers located in Colorado and elsewhere. The trade secrets were acquired and disclosed by the Former Employees in Colorado and acquired by Texana, a bank based in Texas.

99.    Novus has taken reasonable measures to keep its trade secret information secret. Novus stores information in a secured computer network that can only be accessed by authorized employees with login credentials and passwords. Novus prohibits the use of removable devices such as "thumb drives," removable discs, or memory cards on Novus-issued computers to limit users' ability to copy or remove information. If a user attempts to use a removable device he or she receives an error message and is refused access. Further, Novus requires its employees to sign Employment Agreements and Protective Agreements that prohibit them from disclosing this information or use it for any purpose except for fulfilling their responsibilities for Novus.

100.    Sax and Collins, directly and via the Former Employees who they supervised and then solicited to leave Novus for Texana, disclosed Novus's trade secrets to Texana. Some information, such as the pending "pipeline" was directly provided to Texana. Other information was uploaded to filesharing services or

forwarded to personal email accounts for Sax, Collins, or the other Former Employees. On information and belief, that information was removed from Novus's servers for disclosure to and use by Texana. Sax and Collins and the other Former Employees had a duty to maintain the secrecy of the information due to their contractual and common law obligations to Novus.

101.    Texana acquired Novus's trade secret information from Sax, Collins, and the other Former Employees. Texana knew or had reason to know it acquired Novus's trade secret information by improper means. On information and belief, Texana was aware of the Former Employees' Employment Agreements and Protective Agreements or was at least aware that they were subject to confidentiality obligations prohibiting them from sharing this information with Texana. Further, every bank and mortgage lender would understand that other banks and mortgage lenders keep this information confidential not only because it provides a competitive advantage but also because government regulations require personal information be kept strictly confidential.

102.    Texana's misappropriation of Novus's trade secrets has caused actual losses to Novus in an amount to be determined at trial.

103.    Texana's misappropriation of Novus's trade secrets has unjustly enriched Texana in an amount to be determined at trial.

104.    In the alternative, Novus is entitled to a reasonable royalty for Texana's unauthorized acquisition or use of Novus's trade secrets.

105.    Texana's misappropriation of Novus's trade secrets was and is willful and malicious. Novus is entitled to exemplary damages and reasonable attorney's fees as

provided in 18 U.S.C. § 1836(b)(3).

**COUNT FIVE**
**Colorado Uniform Trade Secrets Act (C.R.S. § 7-74-101, *et seq.*)**
**(Against Texana)**

106.    Novus realleges and incorporates by reference each of the allegations
above as if fully set forth herein.

107.    Novus's trade secrets are secret and of value. Novus obtained the trade
secrets by expending significant effort and goodwill, at great expense.

108.    As described above, Novus has taken measures to prevent its trade
secrets from becoming available to persons other than those selected by Novus to have
access thereto for limited purposes.

109.    As alleged above, Sax and Collins, directly and via the Former Employees
who they supervised and then solicited to leave Novus for Texana, disclosed Novus's
trade secrets to Texana. Sax and Collins and the other Former Employees had a duty to
maintain the secrecy of the information due to their contractual and common law
obligations to Novus.

110.    Texana misappropriated Novus's trade secrets by acquiring them. As
alleged above, Texana knew or had reason to know that Novus's trade secrets were
acquired by improper means.

111.    Texana's misappropriation of Novus's trade secrets has caused actual
losses to Novus in an amount to be determined at trial.

112.    In addition to Novus's actual losses, Texana's misappropriation of Novus's
trade secrets has unjustly enriched Texana in an amount to be determined at trial.

113.    In the alternative, Novus is entitled to a reasonable royalty for Texana's unauthorized disclosure or use of Novus's trade secrets.

114.    Texana's misappropriation was attended by circumstances of fraud, malice, and a willful and wanton disregard of Novus's right and feelings. Novus is entitled to exemplary damages as provided in C.R.S. § 7-74-104.

115.    Texana's misappropriation was willful and malicious. Novus is entitled to reasonable attorney fees as provided in C.R.S. § 7-74-105.

**COUNT SIX**
**Breach of Duty of Loyalty**
**(Against Sax and Collins)**

116.    Novus realleges and incorporates by reference each of the allegations above as if fully set forth herein.

117.    Sax and Collins were managerial employees of Novus with significant responsibilities.

118.    While still employed by Novus, Sax and Collins solicited customers for Texana, solicited other Novus employees to terminate their employment, and took confidential, proprietary, trade secret information from Novus for Texana's benefit.

119.    By so doing, Sax and Collins breached their duties of loyalty to Novus.

120.    Sax and Collins' breaches of their duties of loyalty damaged Novus in an amount to be determined at trial.

**COUNT SEVEN**
**Unjust Enrichment**
**(Against Texana)**

121.    Novus realleges and incorporates by reference each of the allegations
above as if fully set forth herein.

122.    Texana has received multiple benefits at Novus's expense. Novus
invested in building its Denver branch, only to have Defendants orchestrate the move
from Novus to Texana so that Texana, not Novus, benefits from those investments.

123.    For example, Novus invested significant resources in recruiting the Former
Employees. But by soliciting Sax and Collins to solicit them to leave Novus en masse,
Texana obtained the benefit of Novus's recruiting investments. In particular, as alleged
above, Novus paid a recruiter with respect to one Former Employee who never
performed any work for Novus's benefit and immediately began working on Texana's
behalf.

124.    Novus provided Sax, Collins, and the other Former Employees with office
space, laptops and other devices, email accounts, marketing tools, and other resources.
But they used these resources for Texana's benefit. Texana was unjustly enriched by
the use of these Novus resources for Texana's benefit.

125.    Novus also invested significant resources in training the Former
Employees and helping them build referral networks. Defendants' improper efforts to
solicit the Former Employees have resulted in Texana obtaining the benefits of Novus's
training investments.

126.   Novus invested significant resources in acquiring confidential and trade secret information that Texana has wrongfully obtained. That confidential information and trade secrets provides a benefit to Texana at Novus's expense.

127.   Novus invested in its loan "pipeline" which was stolen by Defendants for Texana's benefit. Texana has now been enriched by originating those loans, at Novus's expense.

128.   It would be unjust for Texana to retain these benefits. As alleged throughout this complaint, Texana obtained these benefits through violation of federal and state trade secrets laws, breaches of contracts, and torts.

129.   Texana has been unjustly enriched at Novus's expense in an amount to be determined at trial.

**COUNT EIGHT**
**Civil Conspiracy**
**(Against all Defendants)**

130.   Novus realleges and incorporates by reference each of the allegations above as if fully set forth herein.

131.   Defendants had a meeting of the minds on an object or course of action to (1) solicit the Former Employees to leave Novus and join Texana, (2) to improperly obtain confidential and trade secret information from Novus and to use other Novus resources for Texana's benefit, and (3) to wrongfully take business from Novus for Texana's benefit.

132.   Defendants took one or more unlawful overt acts to accomplish this object or course of action. As alleged throughout this complaint, Defendants achieved these

ends through breaches of contract and tortious activity.

133.    Novus has suffered damages as the proximate result of Defendants'
actions in an amount to be determined at trial.

## COUNT NINE
## Aiding and Abetting Tortious Conduct
## (Against all Defendants)

134.    Novus realleges and incorporates by reference each of the allegations
above as if fully set forth herein.

135.    As alleged above, Defendants are each liable for torts in connection with
their scheme to wrongfully steal Novus's business, confidential information, and trade
secrets and deliver them to Novus.

136.    Each Defendant knowingly participated in each of the other Defendants'
breaches and violations. Each Defendant was generally aware of its or his role as part
of an overall illegal or tortious activity, and each Defendant knowingly and substantially
assisted the others' principal violations.

137.    Each Defendant is therefore liable for aiding and abetting the torts of each
other Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Novus prays for judgment and relief from the Court as follows:

1.    Judgment in its favor against Defendants, jointly and severally;

2.    Damages and other amounts allowed by applicable contracts and law in
excess of $75,000 in a total amount to be proven at trial;

3.      Exemplary damages as permitted by 18 U.S.C. § 1836(b)(3), C.R.S. § 7-74-104, and other applicable law.

4.      An award of Novus's costs, disbursements, attorneys' fees, expert witness fees, and other expenses to the extent permitted by 18 U.S.C. § 1836(b)(3), C.R.S. § 7-74-105, and other applicable law;

5.      Any other relief the Court finds appropriate.

**JURY TRIAL DEMAND**

Novus demands a jury trial on all claims or issues so triable.

Dated: February 18, 2025

s/ Ryan M. Sugden
Ryan M. Sugden
**STINSON LLP**
1144 Fifteenth Street, Suite 2400
Denver, CO 80202
Phone: 303.376.8405
Email: ryan.sudgen@stinson.com

Janel M. Dressen (*admission forthcoming*)
Joseph R. Richie (*admission forthcoming*)
**ANTHONY OSTLUND LOUWAGIE DRESSEN & BOYLAN P.A.**
90 South Seventh Street
3600 Wells Fargo Center
Minneapolis, MN 55402
Telephone: 612.349.6969
Emails: jdressen@anthonyostlund.com
        jrichie@anthonyostlund.com

**ATTORNEYS FOR PLAINTIFF**